IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:20-CR-18 |
| v. | ) | |
| | ) | Hon. Anthony J. Trenga |
| ANDY TOVAR, | ) | |
| | ) | Sentencing:  September 27, 2022 |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, by undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits this position paper with respect to the sentencing of the defendant, ANDY TOVAR ("TOVAR").  The United States has reviewed the Presentence Investigation Report ("PSR") and agrees with the findings of the Probation Office, which indicates that the defendant's Guidelines range is a mandatory minimum sentence of ten years up to life incarceration (based on a max capped total offense level of 43 and a criminal history category of IV).  Presentence Investigation Report, ECF No. 363 at ¶¶ 139, 153.  For the reasons set forth below, the government respectfully recommends a sentence of life incarceration.

## BACKGROUND AND PROCEDURAL HISTORY

TOVAR, the First Word or leader of the Guanacos Lil Cycos Salvatrucha ("GLCS") clique of La Mara Salvatrucha Trece ("MS-13"), authorized the murder of two victims and provided the firearm for the murder of a third victim in this case, and also led GLCS' drug trafficking.

**TOVAR's Involvement in the GLCS Murder of M.R.G.**

The first victim TOVAR authorized to be murdered in this case, M.R.G., was brutally slain on July 3, 2017, by four members of MS-13's GLCS clique: Walter Antonio Argueta Amaya, Eduardo Zelaya, Jose Luis Escobar Umana, and Omar Antonio Villalta.  PSR ¶¶ 25–41. Accompanying the GLCS members was Juan Carlos Argueta, a member of the Normandy clique of MS-13.  *Id.*  At the time, M.R.G. worked with Villalta and Argueta at Fabio's Pizzeria in Charlottesville, Virginia.  *Id.* at ¶ 27.  On July 3, 2017, M.R.G., under the presumption that he and Argueta were going to smoke marijuana, drove to a remote location in Charlottesville after work. *Id.* at ¶ 32.  Unbeknownst to M.R.G., however, Villalta had chosen that remote location the day prior as the place to kill M.R.G., and Villalta, Argueta Amaya, Escobar Umana, and Zelaya had been surreptitiously waiting outside of Fabio's Pizzeria to follow M.R.G. and Argueta in a separate car.  *Id.*  Once at the remote location, the MS-13 members ambushed M.R.G.  *Id.*  Villalta and the others used their vehicle to block M.R.G.'s car from leaving, and Villalta brandished a .380-caliber firearm at M.R.G.  *Id.* at ¶ 33.

Argueta Amaya had purchased this firearm in June 2017 with money TOVAR had given him.  *Id.*  Villalta and subsequently Escobar Umana continued to threaten M.R.G. with the firearm, and the group led M.R.G. further into a wooded area where the MS-13 members ultimately attacked M.R.G.  PSR ¶¶ 34–35.  The MS-13 members hacked M.R.G. to death by stabbing and slashing him 144 times with knives and a machete.  *Id.* at ¶ 35.  A picture of his bloodied and beaten body was disseminated to TOVAR and other MS-13 leadership to confirm that they had killed M.R.G.  *Id.*  In response to the photo, TOVAR instructed Argueta Amaya to tell Escobar Umana and Zelaya that they would be promoted to homeboys for their participation in the murder. *Id.*  At the time of this gruesome murder, Zelaya and Argueta were both juveniles.  *Id.* at ¶ 96.

Villalta was a GLCS homeboy who, at the time of the murder, was evading law enforcement in New York due to his involvement in the commission of four murders in the Eastern District of New York. *Id.* at ¶ 26. TOVAR aided and abetted Villalta's escape from law enforcement detection in New York by directing GLCS's then-Second Word, or second-in-command, Christian Martinez Sanchez, to secure housing in Alexandria, Virginia for Villalta. *Id.* Villalta and Martinez Sanchez lived together in Virginia for a period of time before Villalta eventually relocated to Charlottesville, Virginia. PSR ¶¶ 26–27. In and around July 2017, while working with M.R.G. at Fabio's Pizzeria, Villalta sought permission from TOVAR to murder M.R.G. because Villalta believed him to be a member of the rival 18th Street Gang. *Id.* at ¶ 28. As a result, TOVAR authorized M.R.G.'s murder after contacting other MS-13 leaders in El Salvador. *Id.*

In addition to authorizing M.R.G.'s murder, TOVAR aided and abetted the slaying in a number of ways. As the Court learned from trial testimony, TOVAR helped pay for and arranged the purchase of the firearm that was used to threaten M.R.G. and lure him to his grisly demise. TOVAR helped plan the murder with co-conspirators and selected who was going to be involved in the murder. *Id*. at ¶ 29. As the Court learned from testimony and evidence during the trial, after the murder, TOVAR counseled Villalta and Amaya concerning how to dispose of the victim's car by burning it, *id*. at ¶ 36, and advised those involved in the murder to burn their clothes, delete their phones, and otherwise destroy evidence of their involvement in M.R.G.'s murder. Finally, TOVAR expressed his pleasure with respect to what his clique had done to M.R.G., including by relaying that Escobar Umana and Zelaya would be ranked up in the gang for their participation. *Id.* at ¶ 35.

**TOVAR's Involvement in the GLCS Attempt to Murder E.P.A.**

On March 8, 2019, E.P.A. was shot multiple times with a Sig Sauer pistol by D.E., a then-juvenile member of GLCS. *Id*. at ¶¶ 42-44. J.B.A., another GLCS member, attempted to slit E.P.A.'s throat and stabbed E.P.A. around his neck area. *Id.* at ¶ 45. Sometime prior to March 8, 2019, TOVAR had provided members and associates of GLCS with the Sig Sauer pistol used by D.E. in the attempted murder of E.P.A. *Id.* at ¶ 42.

D.E. wanted to murder E.P.A. because E.P.A. had disrespected MS-13 members, including K.C.A.—another juvenile member of MS-13 and co-conspirator in E.P.A.'s attempted murder—while they were previously incarcerated together at the Juvenile Detention Center in Prince William County, Virginia. *Id.* at ¶ 43. D.E. also believed that E.P.A. had begun to associate with an 18th Street—and therefore, rival—gang member during his time in custody. *Id.* D.E. knew E.P.A. from high school. *Id*.

Earlier in the day of March 8, 2019, D.E. had messaged E.P.A. and suggested that E.P.A. come to his home so that they could smoke marijuana together. *Id*. at ¶¶ 43-44. At trial, E.P.A. testified that he thought D.E. was his friend, and was planning to smoke and hang out with D.E. that evening. However, to D.E., E.P.A. was an enemy. Prior to E.P.A.'s arrival, D.E. contacted co-conspirator Roberto Cruz Moreno ("CRUZ MORENO") because he needed CRUZ MORENO's help to murder E.P.A. *Id*. at ¶ 43.

CRUZ MORENO agreed to assist and he, along with K.C.A. and J.B.A., drove D.E. and E.P.A. to a remote location in Bristow, Virginia, under the pretense that they were all going to smoke marijuana together. PSR ¶ 44. Instead, after CRUZ MORENO dropped them off on the side of the road, D.E., K.C.A., and J.B.A. lured E.P.A. into a wooded area, where D.E. shot E.P.A.

4

multiple times, and J.B.A. stabbed E.P.A. multiple times and tried to slit his throat.  *Id*. at ¶ 45. The three retreated to CRUZ MORENO's vehicle, leaving E.P.A. in the woods to die.  *Id.*

Following the attempted murder, as the Court heard via testimony and saw via Telegram messages sent by TOVAR to co-conspirator Jose Rosales Juarez ("ROSALES JUAREZ"), TOVAR repeatedly expressed his disappointment that D.E. was unable to handle the simple task of killing E.P.A., and had emptied the clip in E.P.A. without killing him.

During the trial, the following information was admitted into evidence about the severe injuries E.P.A. suffered at the hands of the co-conspirators.  When E.P.A. arrived at INOVA Fairfax Emergency Department, he was hypotensive (low blood pressure) and hypoxic (low blood oxygen saturation), necessitating an emergency intubation.  E.P.A. was taken to the operating room emergently and was found to have two complex lacerations—one to the cheek and one to the front of the neck, both of which remained actively bleeding—and five gunshot wounds, two to his right leg and three to his abdomen.  Initially there was concern for vascular injury, resulting from the gunshot wounds to his right leg, as his lower extremities were pulseless and cold on exam.  On his second of five days at INOVA Fairfax Hospital, E.P.A. was seen by an orthopedist who noted that he suffered from femoral nerve neuropraxia, meaning traumatic femoral nerve damage.  After his stay at INOVA Fairfax Hospital, E.P.A. was discharged to an acute care rehabilitation facility.  At trial, the Court also heard directly from E.P.A. about the ongoing physical and psychological trauma that he suffered from the co-conspirators' attempt on his life, all of which will be a permanent reminder to E.P.A. of his horrific encounter with GLCS.

**TOVAR's Involvement in the GLCS Attempt to Murder N.M.S.**

On August 12, 2019, the second victim TOVAR authorized to be murdered in this case, N.M.S., was shot twice by a member of GLCS.  *Id.* at ¶ 65.  In and around July 2019, TOVAR

authorized members and associates of GLCS to kill N.M.S. because he was a rival gang member in GLCS-controlled territory. *Id*. at ¶ 52. TOVAR initially learned of N.M.S. on or about July 14, 2019, when co-defendant Marvin Torres ("TORRES") messaged members of the GLCS clique a photo of N.M.S. near the laundromat where he was ultimately shot that showed 18th Street Gang tattoos on N.M.S.'s legs. *Id.* at ¶ 50. On or about July 23, 2019, TOVAR communicated with MS-13 leadership in El Salvador about purchasing a Taurus, Millennium, .45 caliber pistol for use by the clique. *Id.* at ¶ 53. Then, in late July 2019, K.C.A. used the clique's funds to purchase that exact weapon for use by the clique—a Taurus, Millennium, .45 caliber pistol. PSR ¶ 54.

On or about August 4, 2019, TOVAR was informed by members of MS-13 that N.M.S. was at a restaurant and bar in Manassas, Virginia. *Id*. at ¶ 56. TOVAR went to the restaurant to potentially kill N.M.S.; however, there were too many people around. *Id.* Instead, TOVAR had his girlfriend, Mayra Chavez (a.k.a. "Arlyne Tovar"), surveil and obtain information from N.M.S. at the restaurant, such as where he lived. *Id.* During this time, TOVAR sent text messages to Chavez indicating that he was going to take action to kill N.M.S. *Id.* TOVAR also sent pictures and a video of N.M.S. that Chavez recorded to a member of GLCS leadership in El Salvador to confirm N.M.S.'s status as a rival gang member, or chavala, as a reason to kill N.M.S. *Id*. at ¶ 58. That same night, TOVAR was also messaging with ROSALES JUAREZ, who was also surveilling N.M.S. at the restaurant. *Id*. at ¶ 57. The defendant and ROSALES JUAREZ exchanged a photograph of N.M.S. and discussed killing N.M.S. with a firearm. *Id*.

The next day, on August 5, 2019, members and associates of the GLCS clique were shown a video of N.M.S. from TOVAR's phone so that they could identify and attack N.M.S. if they were to encounter him. PSR ¶ 59. TOVAR and ROSALES JUAREZ also continued to discuss their plans to kill N.M.S. *Id.* at ¶ 60. The two exchanged messages about purchasing another firearm

for the clique to use, and TOVAR promised to teach ROSALES JUAREZ how to kill someone with two gunshots—specifically, one shot to the chest, and another to the head.  *Id*. at ¶ 60.  On August 6, 2019, ROSALES JUAREZ confirmed to TOVAR via message that he had purchased a firearm and had provided the firearm to K.C.A.  *Id.* at ¶ 61.

On August 12, 2019, approximately one hour before K.C.A. shot N.M.S., K.C.A. called TOVAR to inform him that N.M.S. was behind a laundromat at Singh Plaza, located on Liberia Avenue in Manassas, Virginia.  PSR ¶ 62.  TOVAR granted K.C.A. permission to kill N.M.S.  *Id.* After receiving permission from TOVAR to kill N.M.S., co-defendant Kevin Perez Sandoval ("PEREZ SANDOVAL") drove K.C.A. and J.B.A. to their house where K.C.A. retrieved a firearm, mask, and a change of clothes.  *Id.* at ¶ 63.  PEREZ SANDOVAL then drove them to a wooded area near the laundromat at Singh Plaza.  *Id*.  K.C.A. shot N.M.S. twice in the stomach from the fence line with a Taurus, Millennium, .45 caliber pistol with the intention of killing him. *Id.* at ¶ 65.  K.C.A. fled the scene and was picked up by PEREZ SANDOVAL and J.B.A. in PEREZ SANDOVAL's vehicle.  *Id.*

Following N.M.S.'s shooting, TOVAR called ROSALES JUAREZ and K.C.A. in order to discuss plans to assist K.C.A. in escaping law enforcement, including obtaining a hotel room for K.C.A. and disposing of K.C.A.'s shoes because co-defendant TORRES had informed TOVAR that police were tracing steps in the area of the laundromat.  *Id.* at ¶¶ 68, 70.  On or about August 13, 2019, TOVAR contacted a member of GLCS leadership in El Salvador to provide an update on the clique's effort to kill N.M.S., including by sending this individual a photograph of police vehicles in the neighborhood sent to TOVAR by TORRES.  *Id.* at ¶ 70.

After the shooting, the severity of N.M.S.'s injuries required that he be transported via helicopter emergency medical services to INOVA Fairfax Hospital in Fairfax, Virginia, for

emergency surgery to save his life.  *Id.* at ¶ 69.  As N.M.S. described during the trial, upon arriving at the INOVA Fairfax Emergency Department, he underwent an emergency surgery as a result of the gunshot wounds he sustained to his abdomen, injuring his small intestine.  At trial, the Court also received into evidence photographs depicting the gruesome post-surgery aftermath and significant scarring that will be a permanent reminder to N.M.S. of his horrific encounter with TOVAR's GLCS.

### TOVAR's Oversight of GLCS's Drug Trafficking Activities

In addition to authorizing the murders of M.R.G. and N.M.S. and providing the firearm that was used in GLCS's attempt on E.P.A.'s life, TOVAR, as First Word of the GLCS clique, oversaw and directed the clique's drug distribution activities.  PSR at ¶ 71.  TOVAR typically provided drugs for his subordinates to sell—in other words, TOVAR was a source of supply for GLCS, and all proceeds were to be returned to TOVAR for use by the clique.  *Id.*  For example, J.B.A. was one of GLCS's primary distributors, and, at TOVAR's direction, sold an average of 2.5 ounces (71 grams) of marijuana per week over a 14-month period, as well as three grams of cocaine per week over a two- to three-month period.  *Id.*

Further, TOVAR was directly involved with the narcotics that were recovered during a traffic stop on April 20, 2019.  Specifically, on or about April 19, 2019, TOVAR and ROSALES JUAREZ discussed a cocaine deal involving CRUZ MORENO on the phone.  *Id.* at ¶ 73.  The next day, CRUZ MORENO sent TOVAR a photo of what TOVAR described as "48 bags of cocaine" inside a larger plastic bag.  *Id.* at ¶ 74.

Later that evening, at the direction of TOVAR, CRUZ MORENO, PEREZ SANDOVAL, J.B.A., and other members and associates of the GLCS clique were driving around the Annandale area of Virginia, conducting narcotics transactions and patrolling for rival gang members to attack.

*Id.* at ¶ 75.  That night, a Fairfax County Police Department ("FCPD") officer on routine patrol observed a sedan exiting a dead-end parking lot in Annandale, and conducted an investigative stop of the vehicle to determine if a trespassing violation had occurred.  *Id.* at ¶ 76.  The vehicle, owned and driven by CRUZ MORENO, was occupied by PEREZ SANDOVAL, J.B.A, and two others. *Id.*  As the FCPD officer approached the vehicle, he observed a strong odor of burnt marijuana emanating from the vehicle and the occupants making furtive movements within the passenger compartment.  *Id.* at ¶ 77.  Once additional FCPD units arrived on scene, the occupants of the vehicle were individually removed.  *Id.* at ¶ 78.

During this process, PEREZ SANDOVAL was found to have a concealed machete tucked into his pants.  *Id.*  An FCPD officer searched the vehicle and located a black backpack on the transmission hump of the rear floorboard of the vehicle.  *Id.*  Within the backpack, this FCPD officer located and recovered a Sig Sauer, model P220, .45-caliber semi-automatic pistol, loaded with six rounds of ammunition.  *Id.*  Law enforcement subsequently determined that this Sig Sauer pistol was the same pistol used to shoot E.P.A.  *Id.* at ¶ 84.  In a separate compartment of the backpack, the officer located small plastic bags commonly associated with narcotics distribution. *Id.* at 79.  In the glove compartment of the vehicle, FCPD located and recovered a black fanny pack containing marijuana and additional small plastic bags containing a white powdery substance subsequently determined to be cocaine.  *Id.*  An electronic scale was recovered from the back-right seat, as well as a camouflage mask.  *Id.*  In the trunk, officers recovered a baseball bat and a black XBG 4.5mm CO2 replica pistol.  *Id.*

CRUZ MORENO, PEREZ SANDOVAL, J.B.A., and the two then-juvenile associates of GLCS in the vehicle were taken into custody.  *Id.* at ¶¶ 76, 80.  Following these arrests, TOVAR had numerous calls with co-conspirators concerning the impact of the seizure of the contraband

and firearm by law enforcement, including an April 21, 2019, conversation with TORRES in which TOVAR explained that it was unlikely that the recovered firearm would be traced back to D.E., who had used it in the attempted murder of E.P.A., so CRUZ MORENO would have to take responsibility for the firearm and any subsequent link of the firearm to E.P.A.'s attempted murder. *Id.* at ¶ 85.

On August 19, 2021, the grand jury returned a superseding indictment charging TOVAR with: Count 1: conspiracy to participate in a racketeering enterprise; Counts 2 and 4: conspiracy to commit murder in aid of racketeering activity: Count 5: conspiracy to distribute cocaine and marijuana; Count 7: attempted murder in aid of racketeering activity; Count 9: assault with a dangerous weapon in aid of racketeering activity; and Count 12: using and discharging a firearm during a crime of violence.  ECF No. 143.  Subsequently, TOVAR was arrested pursuant to a federal arrest warrant.  On February 4, 2022, TOVAR pleaded *nolo contendere* to Counts 1 and 2, and guilty as to Counts 4, 5, 7, 9, and 12.  *Id*. at ¶ 2.

## ARGUMENT

### I.  Sentencing Law

The Court consults both the Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence.  Although the Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005); *United States v. Kimbrough,* 552 U.S. 85, 90 (2007).  Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.  Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in

§ 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary."  The sentence must "reflect the seriousness of the offense, . . . .  promote respect for the law, and . . . provide just punishment for the offense; . . .  afford adequate deterrence to criminal conduct; . . .  protect the public from further crimes of the defendant; and . . .  provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).  In addition, the sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution.  *Id.* at § 3553(a).

Ultimately, the sentence imposed by the court must meet standards of reasonableness.  *See Booker* 543 U.S. at 260-261.

## II.  Sentencing Guidelines Calculation

The PSR calculated a combined adjusted offense level of 52 and a criminal history category of IV for the defendant.  PSR ¶¶ 136, 153.  However, pursuant to U.S.S.G. 5A, comment n. 2, "in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43."  *Id.* at ¶ 139.

In Count Group 1 (Murder of M.R.G.), the base offense level for conspiracy to participate in a racketeering enterprise and conspiracy to commit murder in aid of racketeering activity is 43. *Id.* at ¶ 108.  Two levels were added because the defendant used or attempted to use a person less

than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense under USSG § 3B1.4.  *Id.* at ¶ 111.  Four levels were added because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive under USSG § 3B1.1(a).  *Id.* at ¶ 112.  Two more levels were added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct under USSG § 3C1.1.  *Id.* at ¶ 113.

Additionally, in Count Group 2 (Attempted Murder and Assault of N.M.S.), the base offense level for conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering activity, attempted murder in aid of racketeering activity, assault with a dangerous weapon in aid of racketeering activity is 33.  *Id.* at ¶ 116.  Four levels are added because the victim sustained permanent or life-threatening bodily injury under USSG § 2A2.1(b)(1)(A).  *Id.* at ¶ 117.  Two levels were added because the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense under USSG § 3B1.4.  *Id.* at ¶ 119.  Four levels were added because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive under USSG § 3B1.1(a).  *Id.* at ¶ 120.  Two more levels were added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct under USSG § 3C1.1.  *Id.* at ¶ 121.

12

Finally, in Count Group 3, the base offense level for conspiracy to participate in a racketeering enterprise involving conspiracy to distribute cocaine and marijuana is 12. *Id.* at ¶ 124. Two levels were added for possession of a dangerous weapon. *Id.* at ¶ 125. Two levels were also added because the defendant used violence, made a credible threat to use violence, or directed the use of violence under U.S.S.G. 2D1.1(b)(2).[1] *Id.* at ¶ 126. Two levels were added under § 3B1.1 (Aggravating Role) and under USSG §§ 2D1.1(b)(16)(B) & (E) because the defendant knowingly involved individuals under the age of 18 years in the offense and committed the offense as part of a pattern of criminal conduct engaged in as a livelihood.

Since the Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at U.S.S.G. § 3D1.4, the defendant's resulting combined adjusted offense level is 52. *Id.* at ¶¶ 133-136. As explained above, the defendant's total offense level is therefore 43, as a result of the maximum cap under U.S.S.G. § 5A, comment n.2. The Government concurs with the PSR's Guidelines calculation of the defendant's total offense level.

A.  <u>The Leadership Role Enhancement is Appropriate</u>

The PSR correctly applied a four-level enhancement to TOVAR's Guidelines offense level, pursuant to § 3B1.1(a), because TOVAR was an organizer and leader of criminal activities involving five or more participants.

As the Fourth Circuit has made clear, the application of an adjustment under U.S.S.G § 3B1.1(a) "is appropriate where the evidence demonstrates that the defendant controlled the

---

[1] The United States concurs with the two two-level enhancements under U.S.S.G. §§ 2D1.1(b)(1) and (2). However, in this case, the multiple count adjustment for the grouped count for conspiracy to distribute cocaine and marijuana does not affect the total offense level of 43 even with these four additional points added to the base offense level of 12 for that grouped count. *See* PSR ¶ 113. Accordingly, this position on sentencing does not discuss the applicability of these enhancements.

activities of other participants or exercised management responsibility." *United States v. Wyatt*, 581 F. App'x 174, 176 (4th Cir. 2014) (quoting *United States v. Llamas*, 599 F.3d 381, 390 (4th Cir. 2010) (internal quotation marks omitted)).  Here, TOVAR held a specific leadership position, the leader or "First Word" of the GLCS clique in a clearly defined hierarchal scheme, including during the times when GLCS murdered M.R.G. and attempted to murder E.P.A. and M.R.G.  PSR ¶ 22.  Therefore, the enhancement is appropriately applied.  *See, e.g.*, *United States v. Sandoval*, 6 F.4th 63, 105 (1st Cir. 2021) (affirming the application of a four-level adjustment based on § 3B1.1(a) where the defendant was the First Word of a MS-13 clique).

In addition to being the First Word of GLCS, as the Sentencing Commission has explained, "[a]n upward departure may be warranted . . . in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n. 2.  Here, TOVAR exercised authority and control over GLCS's weapons and narcotics, in addition to exercising control over the day-to-day activities of the clique, as evidenced by his communications with the clique in numerous group chats entered as exhibits at trial.

Although the Court's inquiry here can begin and end with the uncontested fact that TOVAR was the First Word of GLCS during all of the crimes before the Court, *see, e.g.*, *Sandoval*, 6 F.4th at 105, the Sentencing Commission has specified several factors that a sentencing court should consider in deciding whether an adjustment under section 3B1.1(b) is warranted, including: "the exercise of decision-making authority"; "the nature of participation in the commission of the offense"; "the recruitment of accomplices"; "the degree of participation in planning or organizing the offense"; "the nature and scope of the illegal activity"; and "the degree of control and authority

exercised over others."   U.S.S.G. § 3B1.1 cmt. n. 4.   Consideration of each of these factors demonstrates that probation properly applied the enhancement to TOVAR's conduct.

First, TOVAR exercised his own decision-making authority and a significant degree of control and authority over his subordinates as GLCS's First Word, particularly in light of the fact that, as evidenced via testimony during trial, GLCS was an independent clique separate and apart from the East Coast Program of MS-13.   For this reason, TOVAR exercised a heightened degree of decision-making authority than that of a typical First Word.   This decision-making authority included authorizing the murder of M.R.G. and attempted murder of N.M.S.   PSR ¶¶ 28, 52.   With respect to M.R.G., TOVAR's exercise of his decision-making authority resulted in five subordinate members of MS-13 traveling to Charlottesville, Virginia and killing M.R.G.   *Id.* at ¶¶ 29–37.   TOVAR praised the GLCS members who killed M.R.G., and told them that they would be promoted for their participation in this heinous crime.   *Id.* at ¶ 35.   TOVAR reported the killing to MS-13 members in El Salvador and later informed the GLCS members who killed M.R.G. that gang leaders in El Salvador were proud of what the clique accomplished.   *Id.* at ¶ 37.

Second, the evidence put before the Court during trial demonstrates TOVAR's significant participation in the planning, organization, and commission of these offenses, most directly conspiring in and aiding and abetting M.R.G.'s murder and the attempted murder of N.M.S. Significantly, TOVAR provided the clique with the firearms used in both attacks.   *Id.* at ¶¶ 33, 53– 54.   The Court also saw evidence that TOVAR regularly communicated with MS-13 leadership in El Salvador to keep them abreast of the clique's activities in Northern Virginia.   *Id.* at ¶¶ 37, 70.

Lastly, TOVAR actively recruited accomplices to participate in, and played in instrumental role in planning, M.R.G.'s murder and N.M.S.'s attempted murder.   In and around July 2017, TOVAR communicated with Villalta in advance of M.R.G.'s murder to plan and determine who

was going to participate.  PSR ¶ 29.  It was TOVAR and Villalta who chose Martinez Sanchez, Argueta Amaya, Escobar Umana, Zelaya, and Villalta to kill M.R.G.  *Id.*  TOVAR was also involved in planning and organizing the attempted murder of N.M.S.  Between July 14, 2019, and August 12, 2019, TOVAR participated in multiple text message and phone conversations with members of the GLCS clique plotting to kill N.M.S.  *Id.* at ¶¶ 56, 58, 60–62, 68.

Notably, merely because TOVAR communicated with GLCS leadership in El Salvador concerning certain authorizations, does not mean that *he* did not have a leadership role in MS-13. The Sentencing Commission is clear that "[t]here can . . . be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  U.S.S.G. § 3B1.1 cmt. n. 4.  *See also Ortiz v. United States*, 2011 WL 6945711 at *3 (D. Md. Dec. 30, 2011) (leadership enhancement was correctly applied to the defendant, a member of the Latin Kings gang in Maryland, despite the gang's national leadership structure being located in Chicago and New York); *United States v. Si Lu Tian*, 339 F.3d 143, 157 (2nd Cir. 2003) ("one conspirator's leadership role is not dispositive on the question of whether another was also a leader.").  While TOVAR communicated with MS-13 leadership in El Salvador, TOVAR used his own discretion and decision-making authority as GLCS's First Word in the United States, not just in here in Virginia, but also as GLCS's leader in New York and Florida.  PSR ¶ 22.

Furthermore, TOVAR has exercised leadership authority in GLCS for a long time.  He became the First Word of the GLCS clique in 2012.  *Id*.  Thus, there is no question here that TOVAR was the leader of the GLCS clique of MS-13 at the time of the instant offenses.  He held this position in the gang during the murder of M.R.G. and the attempted murders of E.P.A. and N.M.S.  Thus, an adjustment under section 3B1.1(a) is warranted.

B.  The Use of a Minor Enhancement is Appropriate

Further, the PSR correctly applied a two-level enhancement to TOVAR's Guideline offense level, pursuant to U.S.S.G. § 3B1.4, because TOVAR used several persons less than 18 years of age to commit the charged offenses.  Specifically, Zelaya and Argueta were both 17 years old at the time they participated in M.R.G.'s murder, and D.E., J.B.A., and K.C.A. were each also under the age of 18 when they engaged in drug trafficking on behalf of the gang, and when they participated in the attempted murders of E.P.A. and/or N.M.S.  PSR ¶ 96.  As the Sentencing Commission has stated, actions under to which this enhancement apply "include[] directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." U.S.S.G. § 3B1.4 cmt. n. 1.  Given that the murder of M.R.G. and the attempted murder of N.M.S. were planned and organized by TOVAR, as GLCS's leader, and his co-conspirators and that the aforementioned minors actively participated in these offenses, TOVAR's purposeful use of minors is more than enough to show that TOVAR engaged in "an affirmative act that involve[d] the minor in the offense and constitute[d] more than mere presence." *United States v. Gomez-Jimenez*, 750 F.3d 370, 380 (4th Cir. 2014) (quoting *United States v. Mata*, 624 F.3d 170, 176 (5th Cir. 2010)). Thus, the requisite elements of § 3B1.4 are satisfied here.

C.  The Obstruction of Justice Enhancement is Appropriate

Probation's application of a two-level enhancement to TOVAR's offense level, pursuant to U.S.S.G. § 3C1.1, for obstructing justice or impeding the administration of justice is supported by relevant case law.  PSR ¶¶ 98–100.  The Guidelines note that a § 3C1.1 enhancement applies when a defendant "threaten[s], intimidate[es], or otherwise unlawfully influenc[es] a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  U.S.S.G. § 3C1.1 cmt. n. 4(A). Courts across the country have widely applied this enhancement where a defendant did, or

17

attempted to, threaten, intimidate, or unlawfully influence a *potential* witness.  *See, e.g.*, *United States v. Edwards*, 188 F.3d 504 (4th Cir. 1999) (finding the enhancement properly applied where the defendant left a threatening voicemail for a potential witness who did not testify at trial); *United States v. Feliz*, 286 F.3d 118, 120–21 (2d Cir. 2002) (per curiam) (finding the enhancement properly applied where the defendant attempted to coerce potential witnesses to lie to law enforcement); *United States v. Dale*, 498 F.3d 604, 608 (7th Cir. 2007) (finding the enhancement properly applied where the defendant threatened to kill a potential witness identified in the PSR after pleading guilty); *United States v. Rehal*, 940 F.2d 1 (1st Cir. 1991) ("suggesting to potential witnesses that they change their stories as well as refuse to cooperate with law enforcement").

For the obstruction of justice enhancement to be properly applied, the Fourth Circuit requires that a "defendant either threaten the codefendant, witness, or juror in her or her presence or issue the threat in circumstances in which there is some likelihood that the codefendant, witness, or juror will learn of that threat." *United States v. Brooks*, 957 F.2d 1138, 1149–50 (4th Cir. 1992); *United States v. Gordon*, 2022 WL 2764417, at *2 (4th Cir. July 15, 2022).  The Fourth Circuit has found that it is reasonably likely that one will learn of a defendant's threats if that defendant has a history of violence and has previously instructed associates to kill "snitches." *United States v. Rollack*, 570 F. App'x 267, 281 (4th Cir. 2014).

As First Word of GLCS, Tovar was responsible for enforcing the rules of MS-13, including MS-13's prohibition on cooperating with law enforcement.  PSR ¶ 99.  For example, in March 2019, Tovar was heard on a wiretap speaking with one of his subordinates in New York about MS-13 members who were suspected of cooperating with law enforcement.  *Id.*  During the call, TOVAR stated, "we are going to kill the snitches . . ." and identified a specific co-conspirator in M.R.G.'s murder as a "snitch." *Id*.

18

Further, on or about June 30, 2019, after receiving screenshots of draft statements made to federal law enforcement by the person he suspected of cooperating, TOVAR again discussed killing the alleged cooperator, calling him a "son of a bitch" who had implicated TOVAR in multiple crimes. *Id*.

TOVAR clearly intended to intimidate members of MS-13 and reinforce the gang's rule against cooperating with law enforcement when he discussed killing the alleged cooperator. Moreover, it was reasonably likely that the alleged cooperator would learn of TOVAR's threats. First, TOVAR was orchestrating communication with an individual who at the time was housed at the same prison facility as the alleged cooperator. Second, given TOVAR's history of crimes of violence, his longstanding presence as First Word of GLCS, and as enforcer of MS-13 rules, there was a considerable likelihood that the alleged cooperator would learn that TOVAR had made threats against his life for violating the rules of MS-13. Thus, a two-level enhancement under U.S.S.G. § 3C1:1 is appropriate.

   D.   The Offense Level Enhancement for Bodily Injury is Appropriate

The Probation Office correctly determined that TOVAR should receive a four-level enhancement because N.M.S. sustained permanent or life-threatening bodily injuries. U.S.S.G. §§ 2A2.3(b)(1); PSR at ¶ 117.

Section 2A2.1(b)(1) provides a tiered enhancement based on the degree of injury sustained by the victim. A four-level enhancement is applied where the victim sustains permanent or life-threatening injury. The phrase "permanent or life-threatening bodily injury" is defined as "injury involving substantial risk of death; loss or substantial impairment of function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1, cmt. n. 1. The phrase encompasses injuries that are

19

temporary but "life-threatening."  *See United States v. Manning*, 841 F. App'x 541, 543 (4th Cir. 2021) (affirming the application of a four-level enhancement pursuant to § 2A2.1(b)(1)(A) where the victim was shot once in the stomach and survived); *United States v. Sarratt*, 750 F. App'x 213 (4th Cir. 2019) (applying a four-level enhancement under § 2A2.1(b)(1)(A) where a victim was shot in the abdomen and successfully treated at a hospital).  Moreover, an injury can "be life-threatening temporarily and yet have no long-term effects following the victim's recovery." *Sarratt*, 750 F. App'x at 214 (quoting *United States v. Reyes*, 557 F.3d 84, 88 (2d Cir. 2009)).

Here, there is no question that N.M.S.'s injuries meet the standard for the four-level enhancement under § 2A2.1(b)(1)(A) because N.M.S. suffered life-threatening bodily injury as a result of his attempted murder, on August 12, 2019.  *See e.g.*, *id.* (finding the victim suffered "permanent or life-threatening injury" because he was shot in the abdomen at close range and quickly transported to surgery); *United States v. Calbert*, 426 F. Supp. 3d 1022, 1033 (D.N.M. 2019) (holding that the victim's medical records support the conclusion that "the assault put him at substantial risk of death and, therefore, that he suffered life-threatening bodily injury."); *Brown v. United States*, 2016 WL 53827, at *6 (D.S.C. Jan. 4, 2016) (holding that a four-level enhancement was appropriate because the victim survived but underwent life-saving surgeries after being shot in the abdomen by a rival gang member).

During trial, the Court received into evidence testimony by N.M.S. and post-surgery photographs, which depicted the aftermath of the grisly abdominal wounds N.M.S. suffered as a result of the attempt on his life.  In view of the severity of his injuries, there can be no question that N.M.S.'s life was in peril as a result of this shooting and that he would have likely died from his wounds but for significant medical intervention.  The finding of the Probation Office here is entirely consistent with the application of the four-level enhancement in the Fourth Circuit.

Significantly, courts have held that a four-level enhancement pursuant to § 2A2.1(b)(1)(A) is applicable even where a defendant did not himself inflict the permanent or life-threatening bodily injury but conspired to do so.  Section 2A2.1(b)(1)(A) enhancements in conspiracy cases are supported by the principle that applying the enhancement depends on the *results* of the criminal conduct, not the individual defendant's particular conduct leading to those results.  *See generally United States v. Terrell*, 2010 WL 4609111, at *2-3 (D.S.C. Nov. 3, 2010) (holding Application Note 4 does not prohibit application of § 2A2.1(b)(1)(A)'s four-level enhancement, as such enhancement is focused on nature of injury, not on use of weapon).  As such, the bodily injury enhancement has been applied to defendants who did not themselves wield the weapon that directly caused the bodily injury.  *See e.g.*, *United States v. Tinsley*, 166 F.3d 336 (4th Cir. 1998) (affirming the application of a § 2A2.1(b)(1)(A) enhancement where the defendant paid a third party to shoot the victim, and the victim sustained serious life-threatening injuries); *United States v. Mays*, 435 F. App'x 519, 520 (6th Cir. 2011) (affirming the district court's determination on remand that a § 2A2.1(b)(1)(A) enhancement should be applied where the defendant was driving the vehicle when he and a group of co-offenders participated in a drive by shooting that resulted in the victim being shot four times in the back).

Tovar's participation in the conspiracy to murder N.M.S. led directly to the attempt to murder N.M.S. by shooting him on August 12, 2019, the result of which was life-threatening to N.M.S.  Therefore, TOVAR has properly received a four-level enhancement, pursuant to USSG § 2A2.3(b)(1).

### E.   The Defendant is Not Entitled to a Reduction for Acceptance of Responsibility

The PSR also correctly concluded that TOVAR does not qualify for a two-level offense level reduction pursuant to U.S.S.G. § 3E1:1.  PSR ¶¶ 101-02, 138.  "When a defendant clearly

demonstrates that he has accepted responsibility for his offenses, he is entitled to a two-level decrease in his offense level." *United States v. Whitted*, 785 F. App'x 948, 953 (4th Cir. 2019) (citing U.S.S.G. § 3E1:1(a)); *United States v. Gordon,* 895 F.3d 932, 936 (4th Cir. 1990) ("We . . . hold that in order for section 3E1.1 of the guidelines to apply, a defendant must first accept responsibility for *all* of his criminal conduct.") (emphasis added).

The Guidelines instructs sentencing courts to consider several factors in determining whether a reduction under this provision is applicable.  These factors include, but are not limited to, "(A) truthfully admitting the conduct comprising the offense(s) of conviction, . . . (B) voluntary termination or withdrawal from criminal conduct or associations; . . . (H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility."  U.S.S.G. § 3E1:1 n. 1. Given these factors, and TOVAR's *nolo contendere* pleas to Counts 1 and 2, it is clear that he did not admit and accept responsibility for the conduct of those offenses.  *See e.g.*, *McGhee v. United States*, 2016 WL 1626613 at *7 & n. 6 (E.D. Va. Apr. 20, 2016) (An *Alford* or *nolo contendere* plea "would not involve an admission of guilt, and . . . would almost certainly have resulted in [the defendant] receiving no credit for acceptance of responsibility" (citing *United States v. Tunstall*, 155 F.3d 563 (4th Cir. 1998)); *United States v. Alexander*, 99 F.3d 1131 (4th Cir. 1996) (affirming the district court's refusal to reduce the offense level for acceptance of responsibility where the defendant pleaded *nolo contendere* and the district court "properly considered other evidence regarding the reduction").

Courts in other circuits that have addressed the issue have come to a similar conclusion– that a *nolo contendere* plea is inconsistent with acceptance of responsibility.  *See e.g.*, *United States v. Haversat*, 22 F.3d 790, 799 (8th Cir. 1994) (holding that defendant's plea of *nolo contendere*, while continuing to minimize his role in the offense, was not acceptance of responsibility needed

to justify a reduction of the offense level); *United States v. Boyle*, 10 F.3d 485, 490 (7th Cir. 1993) (affirming the district court's refusal to reduce defendant's offense level under the guidelines for acceptance of responsibility after a *nolo contendere* plea because the defendant had not demonstrated any responsibility for his criminal conduct).

Additionally, TOVAR continued his criminal associations with members of MS-13 while he was incarcerated.  PSR ¶ 102.  Further, TOVAR was first indicted in February 2020 and initially pleaded not guilty.  TOVAR did not plead *nolo contendere* to Counts 1 and 2, and guilty to the remaining counts, until a mere 18 days before trial.  *Id*. at ¶¶ 2, 102.  It is evident from these circumstances, particularly his *nolo contendere* pleas before the Court, that TOVAR has not demonstrated that he has accepted responsibility for his role in the charged offenses, and, therefore, he is not eligible for a reduction pursuant to U.S.S.G. § 3E1:1.

### III. A Sentence of Life Incarceration Complies with the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a) and (b).

Section 3553(a) requires a sentencing court to consider "the nature and circumstances of the offense and the characteristics of the defendant," as well as the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" and "to protect the public from further crimes of the defendant."  18 U.S.C. §§ 3553(a)(1), (2)(A)–(C).  The sentencing court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

Applying the sentencing factors here demonstrates that a sentence of life incarceration is appropriate and reasonable.

A. <u>The Nature and Circumstances of the Offenses, the Need to Provide Just Punishment, Adequately Deter Criminal Conduct, and Protect the Public Necessitates a Sentence of Life Incarceration</u>

TOVAR's essential leadership and participation in the serious offenses of which he was convicted clearly demonstrates his contempt for the law and total disregard for the safety of the community. A sentence of life incarceration will reflect the grave nature and circumstances of the offenses, and serve the necessary purposes of providing just punishment, deterring other MS-13 gang members by impressing upon them the severe consequences of such criminal conduct, and protecting the public from the defendant.

TOVAR, the First Word of GLCS, led and organized, conspired, planned, encouraged, and aided and abetted multiple brutally violent murders or attempted murders whose reasons were as senseless as the viciousness of the offenses themselves: to instill fear in those who would dare cross or slight MS-13. In at least two of these heinous crimes, M.R.G.'s murder and E.P.A.'s assault, GLCS had not even confirmed whether the victims actually had any associations with the rival 18th Street Gang.

TOVAR played a central leadership role in the conspiracy that resulted in the gruesome machete and knife murder of M.R.G. Specifically, TOVAR authorized M.R.G.'s murder and chose the MS-13 members to carry it out. PSR at ¶¶ 28-29. Prior to M.R.G.'s murder, Villalta falsely claimed to TOVAR that M.R.G. was an 18th Street Gang member. TOVAR failed to verify or confirm that information despite authorizing M.R.G.'s murder. Following TOVAR's authorization, Argueta lied to M.R.G. in order to lure him to a remote location, where he was confronted by Villalta, Argueta Amaya, and Zelaya with a firearm purchased with clique funds provided by TOVAR. *Id.* at ¶¶ 32-33. M.R.G. was brutally stabbed at least 144 times with knives and a machete to a point that he was unrecognizable. *Id.* at ¶ 35.

24

TOVAR showed no remorse for M.R.G.'s ruthless murder.  Instead, TOVAR saw it as an accomplishment for his clique.  In response to receiving a photograph of M.R.G.'s bloody and beaten body, TOVAR instructed Argueta Amaya to inform Escobar Umana and Zelaya that they would be promoted to homeboys for their participation in the crime.  *Id.*  The next day, TOVAR celebrated the Fourth of July with his co-conspirators Argueta Amaya and Villalta at a park near his home, where he congratulated them on what they had done for the clique the previous night. *Id.* at 37.

GLCS's path of senseless violence in Virginia under TOVAR did not end with GLCS's murder of M.R.G.  As the Court heard ample evidence of during trial, GLCS then attempted to murder E.P.A. in much the same fashion as they had done to M.R.G.—by lying to him and luring him into the woods in remote location, firing a clip of ammunition into him, and attempting to slit his throat.  Somehow, after multiple surgeries, E.P.A. survived this brutal attack but, as the Court learned during trial, his voice, body, and psyche remain permanently scarred from this attack.

Again, TOVAR showed no remorse for what TOVAR's clique had done to E.P.A.  Rather, TOVAR's response to this brutal crime was to inform El Salvador of the attempt and to derisively mock and insult D.E. for being unable to kill E.P.A. despite emptying the clip into him.  In other words, TOVAR's only regret was that D.E. did not successfully murder E.P.A.

GLCS's next target involved even more direct involvement by TOVAR in targeting, planning, directing the actions of GLCS members and associates in surveilling, and, ultimately, authorizing the murder of N.M.S.  Indeed, TOVAR went so far as to have his girlfriend and the mother of his children surveil N.M.S. at a restaurant and take pictures and videos of N.M.S. that TOVAR shared with GLCS members and associates both here in Virginia and in El Salvador.  As the Court learned during trial, TOVAR communicated openly and directly with both his girlfriend

and co-defendant ROSALES JUAREZ about his desire and plans to kill N.M.S., and about how N.M.S.'s attack had to be carefully planned to avoid law enforcement detection.  During trial, the Court saw the ultimate results of TOVAR's desire to kill N.M.S. from the significant scarring that remains from the surgeries to repair the gunshot wounds on N.M.S.'s abdomen and chest.  These physical and mental scars will be a constant reminder to N.M.S. of GLCS's attempt to take his life on August 12, 2019.

As detailed above, N.M.S. suffered grievous injuries as a result of the attempt on his life. But, yet again, TOVAR responded with no remorse when N.M.S. was nearly murdered.  Instead, he directed his co-conspirators in evading law enforcement detection by relaying information from TORRES who was watching law enforcement at the site of the shooting, and helping the co-conspirators find new transportation and a hotel room.

TOVAR's involvement in the victims' senseless murder and attempted murders was all to serve MS-13's warped code of violence and to enforce the gang's rules and demonstrates his contempt for the law and his total disregard for the safety of the people who make up this community.  This was TOVAR's GLCS.  It was the individuals whom the defendant had recruited into the gang and mentored in a life of violence who were pulling the triggers and wielding the knives and machetes in these crimes.  To fund these brutal attacks, TOVAR also coordinated the distribution and sale of drugs on behalf of the gang.  PSR ¶¶ 71–75.

A sentence of life incarceration will serve the necessary purposes of reflecting the nature and circumstances of TOVAR's offenses, providing just punishment, and protecting the public from the defendant—a serial and unrepentant criminal—while also helping to deter other MS-13 gang members by impressing upon them the severe consequences of such criminal conduct. Equally important, a sentence of life incarceration will achieve some measure of justice for the

victims and their families, who have all suffered the awful consequences of MS-13's violent ideology and practice.

B. <u>The Defendant's History and Characteristics Further Support a Sentence of Life Incarceration</u>

TOVAR's history and characteristics—namely, his unapologetic membership in MS-13—further support a lengthy period of incarceration.  There is no question that TOVAR was a leader of and an active participant in one of the most violent criminal organizations in the world: MS-13.  *See, e.g.*, PSR ¶ 22.  TOVAR has had a long history of leadership, membership, and association with MS-13, which he has repeatedly demonstrated in several different ways.  For example, the Court need look no further than the MS-13 tattoos emblazoned on TOVAR's head, arms, and chest to recognize his lengthy dedication and commitment to the MS-13 gang.  The presence of TOVAR's prominent MS-13 tattoos, including those on his head, is indicative of his high-rank within MS-13.

TOVAR's lack of respect for the law is clear.  TOVAR continues to commit crimes despite prior terms of imprisonment and despite the fact he was on probation at the time he committed the instant crimes.  His criminal history illustrates his ongoing associations with MS-13, which dates back to when he was a teenager.  In 2006, when TOVAR was just 17 years old, he was found guilty and sentenced to six months' incarceration for willfully participating in a criminal act—theft of a vehicle—as part of gang activities.  PSR ¶ 141.  However, this conviction was not sufficient deterrence for TOVAR.  His disregard for the law and association with MS-13 persisted, with his next criminal offense occurring less than one year later.  In 2007, TOVAR stabbed an individual with whom the GLCS clique had a dispute.  *Id*. at ¶ 144.  As a result of this conduct, TOVAR was convicted of participation in gang activity and unlawful wounding.  *Id*.  After approximately two years of incarceration, TOVAR was released from custody.  *Id*.  However,

27

TOVAR repeatedly violated the terms of his supervised release, further demonstrating his disregard for the law. *Id*. Specifically, in 2011, Tovar violated his supervised release by incurring new criminal charges in Winchester, Virginia, for driving under revocation or suspension of his license and other vehicle offenses. *Id*. at ¶ 145. Three months later, in early 2012, Tovar was convicted of driving on a suspended license. PSR ¶¶ 146–47. Subsequent to these offenses, TOVAR has demonstrated his total disregard for the law by incurring two convictions for failure to appear and one conviction for providing a false identity to law enforcement. *Id*. at ¶¶ 149–50.

TOVAR is not a victim of circumstance; he has chosen to lead a criminal and violent lifestyle as a long-time leader of MS-13. TOVAR's choices, actions, and commands have led to destruction and carnage, and destroyed families and communities. Based on all of these factors, a sentence of life imprisonment is warranted and appropriate.

## Conclusion

For these reasons, the United States respectfully recommends that the Court impose a sentence of life incarceration.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____
Nicholas J. Patterson
Amanda Lowe
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
E-mail: Nicholas.Patterson@usdoj.gov
           Amanda.Lowe@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 20, 2022, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy of this document to be transmitted to counsel of record.

In addition, I certify that on September 20, 2022, I emailed a copy of the foregoing to the U.S. Probation Officer assigned to this matter:

Kelly Smihal
U.S. Probation Officer
Eastern District of Virginia
Kelly_Smihal@vaep.uscourts.gov

\_\_\_\_/s_____
Amanda Lowe
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
E-mail: amanda.lowe@usdoj.gov
