## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. 20-CR-00018 (AJT)** |
| | : | |
| ANDY TOVAR | : | |

### ANDY TOVAR'S LIFE TRAJECTORY

> *Please send to Santa because you are older and know where he lives: "All I want for Christmas is a five-minute visit with my father."*
>
> -- Note from Andy Tovar's six-year-old daughter to Mr. Tovar's father

> *I bottle up my emotions and then they come out in anger, sadness . . . I try to smile all the time.  I know when I feel sad because I feel empty ----- I pretty much feel empty all the time.*
>
> --Andy Tovar (December 5, 2020)

Andy Tovar embodies the truism that we are all better than the worst thing we have ever done.[1]  Notwithstanding the extremely serious offenses to which he admirably admitted his involvement, he has a sentient and introspective side that is very striking.  Mr. Tovar's ability to process what he has done, as well as his flaws and his regrets, is both unusual and impressive.  His capacity to speak about what is important to him and his reflection on how he came to be in the position in which he finds himself is admirable and rare.  These qualities give reason for optimism about his prognosis going forward.

---

[1] Bryan Stevenson, JUST MERCY 17 (2015) ("Each of us is more than the worst thing we've ever done.").

A full appreciation of Mr. Tovar, his background and the factors that contributed to his coming before the Court is critical to ensuring that his sentencing does not become a formulaic exercise with no acknowledgment of the many dimensions that comprise us all.  Mr. Tovar's very profound regret for his involvement in the offenses, and in the gang world more generally, is deep and sincere.  In private conversations, years before his admission of guilt in this case and from which he did not stand to gain anything, Mr. Tovar described his gang involvement as the aspect of his life of which he is most ashamed.  Consistent with that shame, he is impressively discerning about the confluence of forces that led to that involvement.

### Mr. Tovar's Formative Years and the Confluence of Forces That Led to His Gang Involvement

Although both his parents are from El Salvador, Mr. Tovar was born in the United States and grew up in Virginia.  Mr. Tovar's parents were together from the time his mother was just thirteen-years-old and his father was fifteen.  Both came from extremely poor families in El Salvador and his mother's family was so desperate that they even wanted to get rid of her.  His mother never attended school and cannot read or write and his father has only a third-grade education.  When Mr. Tovar was born his father was twenty-years-old and his mother was still a teenager.  Mr. Tovar was their first child and significantly his mother told Mr. Tovar that she learned how to be a mother with him.

A decisive and impactful moment in his young life was his parents' separation when Mr. Tovar was just six or seven years old.  He recalls being "happy all the time, but [that] the happiness stopped when [his parents] split up."[2]  That separation occurred because Mr. Tovar's

---

[2] Interview with Andy Tovar (September 19, 2020)

mother had a boyfriend (who was more than twenty years her senior).[3]  The devastating effect his parents' separation had on Mr. Tovar is captured in his description of it as "tragic."[4]  During the years his mother was with her boyfriend, Mr. Tovar attended elementary school in Reston, Virginia.  In that time he recalls that the adult supervision of him was so lax that he was able to stay out until 10:30 p.m. each night.[5]  Poignantly, in Mr. Tovar's words, to him "it seemed like forever that [his] parents were separated."[6]  After several years Mr. Tovar's parents reconciled and he attended middle school in Sterling, Virginia.  Although he also attended the first year of high school in Sterling, thereafter his father moved to Stephens City, Virginia and Mr. Tovar attended high school there. Ultimately, Mr. Tovar's parents separated permanently.[7]

Mr. Tovar's parents "worked long hours during his childhood and were rarely home, providing him with little to no supervision[; as a result he] spent most of his time out in his neighborhood, which was rife with gang activity."[8]  Mr. Tovar recalled being as young as eight years old when he would "hang out" at a local basketball court in Reston, Virginia and see gang

---

[3] Interview with Andy Tovar (October 17, 2020)

[4] Interview with Andy Tovar (September 19, 2020)

[5] Interview with Andy Tovar (August 25, 2020)

[6] Interview with Andy Tovar (September 19, 2020)

[7] *Id.  See also* PreSentence Report at 32, ¶165

[8] PreSentence Report at 32, ¶162

members and how he "wanted to be like them."[9]  In his early adolescence Mr. Tovar went to a

meeting where he was "shown the ropes," his name was submitted for gang membership, and he

was "jumped in," enduring the required beatings that entails.[10]  In the next few years, despite his

desire to leave the gang, Mr. Tovar, nonetheless, remained out of a fear of what the gang would

do to him or his family if he tried to leave.[11]  As he explained, one could be beat up merely for

drinking a beer, so leaving the gang had even more severe consequences.[12]

Mr. Tovar recalled that he changed schools often and was "always scared of not fitting

in."[13]  Insightfully he has recounted that he was "afraid of other kids teasing [him and] was afraid

of speaking."[14]  Indeed, "he was subject to bullying by other students due to his family's poor

financial status."[15]  Mr. Tovar has been clear about his feeling that he did not "fit in" and his fear

of being teased by other youngsters.[16]  In short, as a child and young teen, Mr. Tovar clearly had

significant social difficulties, known contributors to gang involvement.  *See* Note 29, *infra*.

---

[9] Interview with Andy Tovar (August 25, 2020)

[10] *Id*.

[11] *Id*.

[12] *Id*.

[13] *Id*.

[14] Interview with Andy Tovar (September 19, 2020).  *See also* Psychological Evaluation (September 18, 2022), Sara E. Boyd, Ph.D., ABPP, p. 3 (regarding Mr. Tovar having been bullied)

[15] PreSentence Report, at 32, ¶163

[16] Interview with Andy Tovar (September 19, 2020)

Indisputably, Mr. Tovar suffered a host of adverse childhood experiences[17] widely acknowledged to contribute to entanglement in the criminal legal system. *See*, "*Predictors of Youth Violence*," United States Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, Juvenile Justice Bulletin (April 2000). Physical abuse and domestic violence, each of which Mr. Tovar experienced,[18] are acknowledged factors in a young person's legal entanglement.  *Id*.  Likewise, the violence he witnessed is also well recognized to play a role in an individual's later illegal behavior. *Id*. These considerations mitigate Mr. Tovar's conduct in that they explain it, without excusing it. In so doing, they suggest that had Mr. Tovar been raised in a more supportive and enriching environment, his life trajectory would have taken a different path.

The significance of the violence Mr. Tovar experienced during his formative years cannot be underestimated. *See* https://www.cdc.gov/violenceprevention/aces/riskprotectivefactors.html (last visited Sept. 1, 2021) (explaining Adverse Childhood Experiences (ACES's) as "potentially traumatic experiences, such as . . . experiencing or witnessing violence . . . that occur in childhood (birth to 17) that can affect children for years and impact their life opportunities"). Importantly, exposure to violence is known to contribute to post-traumatic stress disorder. *See* https://leb.fbi.gov/articles/featured-articles/adverse-childhood-experiences-and-crime (citing

---

[17] *See* www.cdc.gov/violenceprevention/childabuseandneglect/fastfact.html (setting forth adverse childhood experiences as including experiencing violence, abuse, or neglect, witnessing violence in the home or community, having a family member attempt or die by suicide, growing up in a household with, substance misuse, mental health problems, instability due to parental separation or household members being in jail or 10-11) (last visited Sept. 1, 2021)

[18] *See* Note 23, *infra*

U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, *Report of the Attorney General's National Task Force on Children Exposed to Violence,* https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf. "Additional research concluded, "90 percent of juvenile offenders in the United States [have experienced] some sort of traumatic event in childhood, and up to 30 percent of justice-involved American youth…meet the criteria for post-traumatic stress disorder due to trauma experienced during childhood."); *see also*, Damien A. Fair, Alice M. Graham, Brian Mills, "*A Role of Early Life Stress on Subsequent Brain and Behavioral Development*," 57 WASH. U. J.L.& POL'Y 89 (2018).

### The Double-Edged Sword of Mr. Tovar's Gang Involvement

Clearly, Mr. Tovar's involvement in the offenses for which he will be sentenced is inextricably linked to his involvement in the MS-13 gang.  With respect to his gang involvement, during critical years of his development, his parents' absence due to their grueling work schedules is significant.  As Mr. Tovar has explained what he remembers most about growing up is how much his parents worked, though he readily and admirably acknowledges that they did so to provide for him and his siblings.[19] He also recalled that his parents did not attend any school functions or meetings.[20]  Finally, Mr. Tovar's father drank a lot on the days he was not working,

---

[19] *Id*.

[20] Interview with Andy Tovar (October 17, 2020)

effectively making him absent from being available to Mr. Tovar,[21] and, not only did his father drink heavily, but he also was physically abusive to Mr. Tovar's mother.[22]

Mr. Tovar's recruitment into MS-13 appears to have begun when he was a barely entering adolescence. Given Mr. Tovar's parents' other obligations during his formative years as well as some family dysfunction, it stands to reason that his involvement with a gang filled a void for him.[23]   The role of surrogate family played by a gang is well recognized.[24]   As Mr. Tovar has explained he "was not popular until [he] joined MS-13."[25]

---

[21] *Id.*

[22] PreSentence Report at 32, ¶165.  *See also* Psychological Evaluation (September 18, 2022), Sara E. Boyd, Ph.D., ABPP, p. 5 (regarding Mr. Tovar having witnessed his mother being physically attacked by his father and he, himself, having been beaten with extension cords and belts severely enough to have resulted in marks)

[23]*See* James C. Howell, *Youth Gangs: An Overview*, at p. 6  (listing "lack of adult male role models" as "risk factors" in the "family domain" that contribute to gang involvement of youth) available at **https:// www.ncjrs.gov/pdffiles/167249.pdf** *See also* **https://www.cdc.gov/violenceprevention/acestudy/ index.html** ("Adverse Childhood Experiences (ACEs), have a tremendous impact on future violence victimization and perpetration, and lifelong health and opportunity.") (last visited August 29, 2022).  *See also* Note 28, *infra*.

[24]Phelan A. Wyrick and James C. Howell, *Strategic Risk-Based Response To Youth Gangs*, JUVENILE JUSTICE JOURNAL, VOL. IX, NO. 1, p. 24 (September 2004) ("Key family risk factors for gang membership include the family structure (*e.g.* broken home), family poverty, . .[ and p]oor family management, including poor parental supervision (monitoring) and control of children, has been shown to be a strong predictor of gang membership") (citation omitted).  available at **www.ncjrs.gov/html/ojjdp/ 203555/jj3.html**  *See also* OJJDP MODEL PROGRAMS GUIDE: *Gang Prevention* available at **www.ojjdp.gov/mpg/progTypesGangPrevention** ("social, economic and cultural forces push many young people into gangs") *See also*, Phelan A. Wyrick and James C. Howell, *Strategic Risk-Based Response To Youth Gangs*, JUVENILE JUSTICE JOURNAL, VOL. IX, NO. 1, p. 22 (September 2004) (" . . . [T]he accumulation of risk factors greatly increases the likelihood of gang involvement . . .[and] . . .the presence of risk factors in multiple domains appears to increase the likelihood of gang involvement even more than the general accumulation of risk factors."),  available at **www.ncjrs.gov/html/ojjdp/203555/ jj3.html**

[25] Interview with Andy Tovar (Aug. 25, 2020)

In a commonly acknowledged phenomenon, *see* Note 28, *infra*, the gang members "were the people [Mr. Tovar] looked up to and [who] made him feel protected."[26]  As Mr. Tovar has explained, he perceived gang members as "big brothers" who did not "give [him] love, but [with whom he] felt a bond."[27]  Insightfully, however, Mr. Tovar has observed the difference between what the gang provided and what a family provides, stating that what the gang provides "is not like a parent's love that is always there."[28]  Beyond providing a feeling of belonging, gang membership has been acknowledged as a means used by young people to compensate for many of the adjustment problems they encounter.[29]  Given Mr. Tovar's fears of not fitting in and the

---

[26] PreSentence Report, at 32, ¶163

[27] Interview with Andy Tovar (October 17, 2020)

[28] *Id.*

[29] James C. Howell, *Youth Gangs: An Overview*, p. 5 (August 1998) ("Feeling marginal, adolescents join gangs for social relationships that give them a sense of identity.  For some youth, gangs provide a way of solving social adjustment problems, particularly the trials and tribulations of adolescence") (citations omitted), available at **https://www.ncjrs.gov/pdffiles/167249.pdf**  *See also Id.*, at 6  (listing "desire for group rewards such as status, identity, self-esteem, companionship, and protection" as "risk factors" in the "individual domain" that contribute to gang involvement of youth)  available at **https://www.ncjrs.gov/ pdffiles/167249.pdf.**; Carl S. Taylor and Pamela R. Smith, *The Attraction of Gangs: How Can We Reduce It?* in CHANGING COURSE: PREVENTING GANG MEMBERSHIP (2013), available at  **https:// www.justice.gov/sites/default/files/usao-sdoh/legacy/2013/10/24/Changing%20Course%20- %20Preventing%20Gang%20Membership.pdf#page=9&zoom=auto,-64,792** p. 27 ("Youth can perceive that gangs offer empowerment — and the attraction of gangs to some youth is enhanced if they feel that gang members recognize and listen to them. Gangs can fill the void left by dysfunctional families and poor education, and some youth see them as providing protection, support, excitement, money and status. When all else in society fails at the time in their lives when they are willing to take risks, young people can regard a gang as providing an alternative to just accepting the socioeconomic challenges in their environment."); FOCUS ADOLESCENT SERVICES *Gangs: Awareness, Prevention, Intervention*, (outlining some of the reasons for joining a gang as including, *inter alia*, "a search for love, structure and discipline," "a sense of belonging and commitment,"  "companionship, training excitement and activities," "a sense of self-worth and status," a place of acceptance," and "the need for physical safety and protection"), available at **www.focusas.com/Gangs.html**

teasing and bullying to which he was subjected, *see* Notes 14, 24, and 27 (and accompanying text), *supra*, gang membership did this in Mr. Tovar's case.

Notwithstanding the void the gang filled for young Andy Tovar and despite his desire to do so, extricating himself from the gang's clutches seemed impossible to him.  As he has explained, despite the many times he disagreed with the gang and had wished he could have defied its wishes, to do so would have risked his own safety.[30]  In frightening terms Mr. Tovar has explained that he "could not say [he] did not want to stay with the gang because they would think [he] was a deserter, and [he] would not be here anymore; [he] would have been punished if [he] had tried to leave the gang."[31]  Indeed, after his 2009 release from a sentence in Docket No. 18761 (Loudon County Circuit Court), Mr. Tovar had failed to "report" to the gang for an extended period of time and ultimately, he had to show gang "homeboys his paper-work to convince them that he was not cooperating with the authorities.[32] Mr. Tovar was beaten up for his failure to have "presented" himself to the gang upon his release[33] and he was "taken" by the gang to be tattooed, spending 45 days with six gang members sleeping in different houses.[34]  The neck tattoo Mr. Tovar has is one he was forced to get for his failure to report to the gang upon his

--------------------

[30] Interview with Andy Tovar (September 13, 2020)

[31] Interview with Andy Tovar (November 13, 2020)

[32] Interview with Andy Tovar (December 5, 2020)

[33] Interview with Andy Tovar (December 5, 2020)

[34] Interview with Andy Tovar (September 19, 2020)

release in 2009.[35]  The other punishments he endured at the hands of the gang for that

transgression were a beating and a warning that "if [he] was missing in action for five minutes,

[the gang] would find [him]."[36]  As Mr. Tovar has explained, he "felt [he] had no choice after

that."[37]  After his 45 days sleeping in different houses with gang members, he was required to

send the gang text messages on a daily basis explaining that he was attending to personal

matters.  As Mr. Tovar powerfully explained, a brief "day and a half [he] was without [the gang,

he] was stress free."[38]

### The Relevance of Mr. Tovar's Psychological Frailties

Dr. Sara Boyd's psychological evaluation of Mr. Tovar identifies a number of factors that

lead her to provisional diagnoses of Mr. Tovar that include post-traumatic stress disorder[39] and/or

Bipolar Disorder.[40]  Each has been recognized as directly relevant to and mitigating in

sentencing.  *See generally Porter v. McCullum*, 558 U.S. 30, 33 (2009) (acknowledging the

---

[35] Interview with Andy Tovar (September 5, 2020)

[36] *Id.*

[37] Interview with Andy Tovar (September 19, 2020)

[38] *Id.*

[39] *See* DSM-V § 309.81 (discussing witnessing or directly experiencing actual or threatened death or serious injury as a component of post-traumatic stress disorder and setting forth the environmental factors that place someone at risk for post-traumatic stress disorder as "lower socioeconomic status; lower education; exposure to prior trauma (especially during childhood); childhood adversity (*e.g.*, economic deprivation, family dysfunction, parental separation or death); cultural characteristics (*e.g.*, fatalistic or self-blaming coping strategies); lower intelligence; minority racial/ethnic status; and a family psychiatric history)").

[40] Psychological Evaluation (September 18, 2022), Sara E. Boyd, Ph.D., ABPP, pp. 7-8

mitigating relevance of "abusive childhood, . . . trauma,  . . . long term substance abuse, and impaired mental health . . .").

The caselaw under U.S.S.G. § 5K2.13 is instructive in how to take Mr. Tovar's mental health into account under 18 U.S. Code §3553. In the context of departures under U.S.S.G. §5K2.13, courts have acknowledged post-traumatic stress disorder as a basis upon which to depart downward at sentencing.  *See e.g.*, *United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) ("'Reduced mental capacity,' . . . comprehends both organic dysfunction and behavioral disturbances that impair the formation of reasoned judgements . . .[A] defendant suffering from post-traumatic stress disorder, an emotional illness, is eligible for  . . . a departure [under U.S.S.G. § 5K2.13] if his ailment distorted his reasoning and interfered with his ability to make reasoned decisions"); *United States v. Pelloski*, 31 F. Supp.3d 952 (S.D. Ohio 2014); *United States v. Ferguson*, 942 F. Supp.2d 1186, 1189 (M.D. Ala. 2013) (stating that "PTSD occurs in persons who experienced an extremely traumatic event and, following the event, re-experience the event in their day-to-day lives"); *United States v. Flowers*, 946 F. Supp.2d 1295 (M.D. Ala., 2013).  *See also* Betsy J. Grey, *Neuroscience, PTSD and Sentencing Mitigation*, 34 CARDOZO L. REV 53 (2012).  Dr. Boyd identifies a number of factors in Mr. Tovar's background that demonstrate the traumas he has suffered during his life, including the physical abuse to which he was subjected as a child and that he witnessed as a child within his home, the violent homicide of his infant son, the many physical assaults he witnessed and endured, and witnessing a dead body at a young age.[41]

---

[41] *Id*. at 4-5

In explaining the relevance of PTSD to a departure for diminished capacity under U.S.S.G. § 5K2.13, in *Cantu*, the Ninth Circuit explained that the "inquiry into the defendant's mental condition and the circumstances of the offense must be undertaken 'with a view to lenity, as section 5K2.13 implicitly recommends.'" *United States v. Cantu*, 12 F.3d at 1511, (quoting *United States v. Chatman*, 986 F.2d 1446, 1454 (D.C. Cir. 1993)). Moreover, the Ninth Circuit recognized that "the disorder need be only a contributing cause, not a "but-for" or sole cause, of the offense . . . The defendant's eligibility [for a departure under 5K2.13] remains the same whether his impairment contributed greatly to the commission of the offense, or hardly at all." *Id.* (citing, *inter alia*, *United States v. Perkins*, 963 F.2d 1523, 1526 (D.C. Cir. 1992)). *See also United States v. Leandre*, 132 F.3d 796, 803-804 (D.C. Cir. 1998) (". . . reduced mental capacity need not be the necessary cause of the commission of [a] crime . . . for [an offender] to be eligible for a downward departure under section 5K2.13 . . . Whether a defendant's reduced mental capacity 'contributed to the commission of a crime' is an individualized factual determination to be made by a sentencing court in light of the factual record before it . . . [T]he court is called upon to consider the defendant's individual characteristics in exercising its decision to depart") (citation omitted); *United States v. Speight*, 726 F. Supp. 861, 868 (D.D.C. 1989) (recognizing that co-morbid substance abuse and mental health affliction does not defeat departure under U.S.S.G. § 5K2.13).

### The Unseen Dimensions of Andy Tovar

As we all are, the Andy Tovar who will come before the Court for sentencing is a multidimensional individual.  His redeeming qualities long have been hidden behind his exterior veneer – or at least the persona he had to adopt outside of his family.  Despite his participation in

the serious offenses in which he commendably admitted his involvement, Mr. Tovar has an impressive other side that he conceals but that, nonetheless, gives reason for optimism about his future.

Mr. Tovar's capacity to look back on his past and see forks in the road at which he wishes his life had taken different directions is instructive. For example, in reflecting on his first felony conviction[42] Mr. Tovar ardently wishes he had not been prosecuted as an adult as he believes that without that felony conviction on his record, he would have been able to secure a good job, gone back to school and even attended college, fulfilling his wish to become a paralegal.[43]

Similarly, Mr. Tovar is achingly honest about the profound and lasting effects the many losses he has suffered have had on him. Mr. Tovar describes his worst memories as being all the people in his life who have died, stating that the losses "changed how [he] thought."[44] The sudden death of his aunt, Anna Tovar, who had lived with Mr. Tovar and his family and taken care of him and who died in a car accident in 2009 while Mr. Tovar was incarcerated, was devastating to him. In his words, "she was like a mother to [him.]" As he has explained he "still gets sentimental about her, but [he does] not like to cry." When he lost his aunt Mr. Tovar

---

[42] Loudon County Circuit Court, Docket No. 18761 (PreSentence Report, p. 25, ¶145)

[43] Interview with Andy Tovar (September 19, 2020)

[44] Interview with Andy Tovar (September 13, 2020)

questioned "why good people die."[45]  The impact his late aunt had on Mr. Tovar is reflected by the fact that he named his daughter, Anna Belle, after her.[46]

Equally as devastating, if not more so, as the loss of his aunt, and five days after his first birthday, Mr. Tovar's son, Jason Perez, was killed on December 10, 2014, by his mother's then-boyfriend, Melvin Edenilson Melendez.[47] Mr. Melendez was charged in Prince George's County Circuit Court in case number CT150199X.

Additional evidence of Mr. Tovar's hidden sentient side is reflected by the tattoos he has of family members' names, which bespeak the strong importance of family to Mr. Tovar.  Aside from the tattoos the gang forced upon Mr. Tovar, he also has tattoos of the names of his late aunt, his mother, his daughter, and his wife's nickname.[48]  This powerful and permanent statement of the value Mr. Tovar places on family, despite his own turbulent upbringing, *see* pp. 2-6, *supra*,  is a testament to how significant his family is to Mr. Tovar.

Not only does Dr. Boyd note the importance of family to Mr. Tovar,[49] but the compelling words of Samantha Tobar are evidence that Mr. Tovar's actions speak louder than words:

> [Mr. Tovar] took care of me when I was little. . .  [He] has played a huge role in my life[, as . . . ] basically a father figure.  I grew up in a toxic household with my aunt and it brought me to the darkest point in

---

[45] *Id.*

[46] Interview with Andy Tovar (September 5, 2020)

[47] https://www.washingtonpost.com/local/crime/hyattsville-man-is-charged-with-murdering-girlfriends-1-year-old-son/2014/12/16/dfbea8ce-8583-11e4-b9b7-b8632ae73d25_story.html

[48] *Id.*

[49] Psychological Evaluation (September 18, 2022), Sara E. Boyd, Ph.D., ABPP, p. 3

> my life . . . [M]e and my sister decided to leave that house.  The
> biggest thing that I'll always be grateful to [Mr. Tovar] for is when he
> picked up the phone and took us in to live at his house.  I was very
> depressed during that time and . . . [due to] him I am still living in this
> world. Before he went to jail, he brought a lot of happiness into my life.
> People make mistakes all the time, but that day specifically showed me
> how [Mr. Tovar] has a huge heart.  He's willing to go through any
> obstacles to help out his family and make them happy.

Ms. Tovar's words powerfully demonstrate that through his own experiences growing up in a

violent and dysfunctional family, Mr. Tovar learned how to be the antithesis of what he endured,

providing the love and support he did not have during his formative years, and saving Ms. Tobar

when she indicates she was on the verge of taking her own life.

Similarly, in his letter to the Court, Jose Saldivar echoes Ms. Tobar's examples of the

importance Mr. Tovar places on family.  Although not technically brothers, Mr. Saldivar

describes their relationship as being that of "true brothers," adding that Mr. Tovar is "a great

example of how a man is supposed to take care of his family."  In Mr. Saldivar's words, he "can't

count how many times [Mr. Tovar] has helped [him] through tough situations, [including] giving

[him] and [his] sister a place to stay with [their] kids when [they] had nowhere to go and asking

nothing in return . . ."  Through gestures like those reflected by Mr. Saldivar and Ms. Tobar Mr.

Tovar's capacity for empathy and identifying with others is readily apparent.

Likewise, Mr. Tovar's ability to put himself in others' shoes and his deep shame at his

involvement with a gang has manifested in reflective comments he has made about trying to hide

his gang membership from family members, thereby demonstrating his empathetic side and his

ability to understand others' perspectives.  For example, Mr. Tovar has explained that he "tries to distance [him]self from people [he] think[s] might be embarrassed by [him.]"[50]   As he shared

> I distance myself from people I think might be embarrassed by me. My godmother always invited me to her house, but I never went because I thought she would be embarrassed by me.  Most of the time I want my family to like me, but I do not want them to be embarrassed by me.  I never take my hat off [because of my tattoo.  I have had my had tattoo for six or seven years. It was a punishment [from the gang] because I was missing in action . . . after I was released from state prison.

Interview with Andy Tovar (September 19, 2020).  In a similar vein, describing himself as the "black sheep of the family," Mr. Tovar has expressed how he has "put [his] family through a lot of embarrassing moments and how [he is] so very ashamed of that."[51] In short, Mr. Tovar clearly has demonstrated the capacity to see others' perspectives and to appreciate the effect his actions have on them.

Beyond his contrition and introspection, Mr. Tovar has been making strides toward self-improvement through reading and a spiritual awakening.  Through reading the Bible Mr. Tovar has acknowledged the need to "pay for what [one has] done."  To his credit he has used reading the Bible as a coping mechanism, explaining that "when [he] get[s] mad or upset, [he] read[s] the Bible" and that it gives him "peace, something that has never happened before."[52]  Recognizing the value in this approach, Mr. Tovar has acknowledged that "had [he] taken this approach on the

---

[50] *Id*.

[51] Interview with Andy Tovar (September 5, 2020)

[52] Interview with Andy Tovar (November 13, 2020)

street, [he] never would have been in [his current] situation," adding longingly that he wishes he "could go back in time."[53]

In addition to the Bible, through the many other books he has been reading Mr. Tovar has expanded his horizons and awareness of the world around him.   He has been reading books about religion, history, and other subjects.  Mr. Tovar also has played chess, a game known for its demands on concentration and mental acumen, and has taken advantage of the very limited options available to him at the Alexandria Detention Center to expand himself, such as through joining a book club and taking a course in "decision points."  While he cannot un-ring the bells of the past, through the efforts he has made during his incarceration, Mr. Tovar has demonstrated his determination to grow and learn from his mistakes.

Beyond the factors mitigating any criminal behavior, are Mr. Tovar's positive traits that speak powerfully to dimensions beyond his involvement in the offenses of which he was convicted.  Those positive qualities include his deep commitment and heartfelt devotion to his family, his selflessness in taking in struggling young people who were not his own children, and his commendable ability to be reflective about himself and how he came to be involved in the offenses for which he will be sentenced.  In short, as is true of us all, Mr. Tovar is not defined by his worst moments and is a multi-dimensional individual with many redeeming qualities. In conclusion, his actions have shown that he is more than the worst things he has ever done.

---

[53] *Id.*

**Dated: September 19, 2022**           Respectfully submitted,

                                        s/Santha Sonenberg

                                        _____

                                        Santha Sonenberg (D.C. Bar No. 376-188)
                                        Mitigation Specialist
                                        (202) 494-7083
                                        santhasonenberg@yahoo.com